## THOMAS M. RUSSELL *vs.* THE MIDDLETOWN CITY SCHOOL DISTRICT ET AL.

First Judicial District, Hartford, May Term, 1924.
WHEELER, C. J., BEACH, CURTIS, KEELER and ELLS, Js.

An express grant of power to a municipal corporation to borrow money carries with it the implied power to issue negotiable bonds; and, therefore, the Middletown City School District could legally issue bonds to pay for the erection of a new schoolhouse and to retire indebtedness previously contracted for the purchase of school sites and the enlargement of an existing schoolhouse, under the authority conferred upon school districts generally by § 920 of the General Statutes "to lay taxes and borrow money" for the purposes therein enumerated.

In the present case, the plaintiff claimed that Chapter 111 of the Public Acts of 1923, providing that "no municipality or subdivision thereof" shall incur any bonded indebtedness in excess of five per centum of its grand list, should be construed to read, "no town or subdivision thereof," and that, so construed, it required that the computation of the indebtedness of the Middletown City School District should include the indebtedness of the Town of Middletown and the City of Middletown, since the School District and the City were merely subdivisions of the Town. *Held* that the claim was without merit, because the School District and the City were subdivisions of the Town only in a territorial sense, each being a politically distinct and independent unit.

Argued May 6th—decided July 28th, 1924.

SUIT praying for a declaratory judgment determining the existence or nonexistence of the power of the defendant school district to issue bonds as proposed by it, brought to and reserved by the Superior Court in Middlesex County, *Hinman, J.,* upon an agreed statement of facts, for the advice of this court. *Superior Court advised that the school district has power to issue the proposed bonds.*

The defendant school district was created by special act of the General Assembly in 1889 (Special Laws,

Conn., Vol. 10, p. 1361) and the City of Middletown was incorporated by special act many years before. The territorial limits of these corporations are the same. The Town of Middletown has consolidated all of the school districts outside of the city limits into one school district.

At a meeting of the legal voters of the Middletown City School District held on February 14th, 1924, a resolution was adopted, a copy of which is a part of the finding. This resolution recites a proposal to erect a new schoolhouse at a cost of about $150,000, the amount of the total indebtedness of the district as being within the limit fixed by law, the authority to issue bonds by virtue of General Statutes, § 920, and Chapter 111 of the Public Acts of 1923, and proceeds to authorize the issue of bonds to the amount of $200,000, for the purpose of paying all or a portion of the indebtedness of the district and for the erection of a schoolhouse. Such bonds are to be of the denomination of $1,000 each, payable to bearer, with interest at the rate of four and one half per centum per annum, payable semiannually with interest coupons attached. The bonds are payable in instalments of $10,000 each year until September 1st, 1944.

The obligation of approximately $150,000 which it is proposed to meet from the proceeds of the sale of the bonds authorized by this resolution, had not been actually incurred on February 14th, 1924, and will not have been incurred on September 1st, 1924. The obligation of $30,000 which it was proposed to meet from the proceeds of the sale of bonds, was incurred on October 1st, 1920, and will be a valid outstanding obligation of the Middletown City School District on September 1st, 1924. The obligation of $23,000 which it was proposed to meet from the proceeds of the sale of bonds, was incurred during February and March, 1923, and

Russell *v.* Middletown City School District.

will be a valid outstanding obligation of the Middletown City School District on September 1st, 1924.

The Middletown City School District and the other defendants, Arthur L. Allin and Revilo C. Markham, as officers thereof, are about to issue the bonds as authorized and directed by the resolution, and the plaintiff is a legal voter and taxpayer in the Middletown City School District and the owner of real estate located therein. Further facts appear in the opinion.

The questions upon which the advice of the Supreme Court of Errors is desired are as follows:

1. Whether or not, under said resolution, the Middletown City School District is legally authorized to issue any bonds whatever.

2. Whether or not, under said resolution, the Middletown City School District is legally authorized to issue enough of the bonds therein described to satisfy the two obligations aggregating $53,000 specified in said resolution or either of them.

3. Whether or not, under said resolution, the Middletown City School District is legally authorized to issue sufficient of said bonds described in said resolution to erect a new school building, as therein stated at a cost of not exceeding $150,000.

*Bertrand E. Spencer*, for the plaintiff.

*Ernest A. Inglis*, for the defendants.

KEELER, J.   Addressing his claim to the first question propounded for our advice, the plaintiff contends that the defendant district has no legal authority to issue the bonds proposed in its vote authorizing such issue.

It is provided in the second section of the Act incorporating the district, that it "shall have, possess,

and enjoy all the rights and privileges and be subject to all the liabilities and obligations provided in the Act of 1855, entitled 'An Act in addition to and in alteration of an Act concerning Education and all acts in amendment and alteration thereof,'" etc. The Act of 1855 referred to is Chapter 50 of the Public Acts of 1855, providing for the organization of school societies, and does not in terms authorize those societies to borrow money. By Public Acts of 1856, Chapter 41, § 10, it is provided that school societies organized under the Act of 1855, which are not coextensive with the towns in which they are located, shall become school districts with the powers and duties of such organizations. Some unimportant exceptions are made in this Act, not bearing upon the questions in this case. By Public Acts of 1865, Chapter 5, it was enacted that "the several school districts of this State are hereby empowered to borrow money, for any purpose for which they are now authorized to lay a tax." This last named Act has been incorporated in successive revisions of the General Statutes, and is now found in § 920 of the Revision of 1918, which is printed in full in the footnote.

Sec. 920. POWERS OF SCHOOL DISTRICTS. Every school district shall be a body corporate, and shall have power to sue and be sued, to purchase, receive, hold and convey real and personal property for school purposes; to build, purchase, hire and repair schoolhouses, and supply them with fuel, furniture and other appendages and accommodations; to establish schools of different grades; to purchase globes, maps, blackboards and other school apparatus; to establish and maintain a school library; to employ teachers, except for such time as the town may direct the school visitors to employ the teachers, and, when a board of school visitors shall appoint a superintendent under the provisions of section 897 such superintendent with the approval of said board of school visitors shall employ the teachers who shall be paid by the selectmen; to pay the wages of such teachers as are employed by the district committee in conformity to law; to lay taxes and borrow money for the foregoing purposes; and to make agreements and regulations for establishing and conducting schools, not inconsistent with the regulations of the town having jurisdiction of the schools in such district.

It is clear that at the time of incorporation the defendant district had power to borrow money and that at present it has such power, which power is possessed by all school districts in the State. With the statute last quoted in view, the plaintiff urges that the district has no power to issue bonds in accordance with the provisions of its resolution above referred to, by virtue of its power to "lay taxes and borrow money for the foregoing purposes." Calling attention to the fact that the bonds which it is proposed to issue are negotiable instruments, plaintiff urges that while the power of a municipality to issue negotiable bonds running over a long term, implied from the power to borrow money, is a question upon which there is great diversity of opinion, the better rule denies this implied power. The conflict of authority stated by plaintiff in fact exists.

The question has arisen for adjudication under two types of cases. In the one there has been no express authority in the municipality to borrow money, but that authority has been implied from the power granted by charter or general law to carry out the express powers granted the corporation to exercise certain functions granted to or imposed upon it, and then a further power has been implied to effect the borrowing by issue of negotiable securities, an implication upon an implication. In the second type of cases, the power to borrow exists by express legislative grant, and the power to issue negotiable securities has been implied. With cases of the first description we are not concerned, since in the instant case the power to borrow money for the purposes set forth in the Act is expressly given.

During the greater part of the past century, the courts, Federal and State, almost uniformly held that the power to borrow money carried with it the power to issue negotiable bonds. The cases involving the

point arose mostly in the older States, and the judicial holdings were apparently sustaining a uniform and customary course of financial procedure.

In the fourth edition (1890) of Dillon on Municipal Corporations, the decisions amply justified stating the law to be that "*express power* to a municipal corporation 'to borrow money' is usually held to include the power to issue its negotiable bonds, or other securities to the lender." Vol. 1, § 127. In the fifth edition of this work, the learned author notes the changed current of decision leading to serious qualification of his prior statement. 2 Dillon on Municipal Corporations, §§ 873, 874, 877. This change in judicial attitude arose from a large volume of litigation occurring mostly in the western and southwestern States, which was largely conducted in the Federal courts. It was an incident to the rapid and phenomenal industrial and financial development of the whole country in the period following the Civil War. Large undertakings by municipalities in the way of public improvements and grants of money to railroads inconsiderately and improvidently undertaken, were financed by reckless prodigality in the issue of municipal securities.

At first, decisions were in accord with the law as previously understood and as quoted above. *Rogers* v. *Burlington,* 70 U. S. (3 Wall.) 654; *Mitchell* v. *Burlington,* 71 U. S. (4 Wall.) 270. From time to time in various cases the United States Supreme Court in one way or another narrowed the scope of the doctrine, and in *Merrill* v. *Monticello,* 138 U. S. 673, 11 Sup. Ct. 441, the court held that the implied power (if it existed) of a municipality to borrow money in execution of powers expressly conferred by law did not authorize it to create and issue negotiable bonds, and that the power to borrow money and the power to give an obligation which may circulate in the market freed from any equi-

tics which may be set up by the maker, were essentially different in nature and legal effect. This series of decisions culminated in the case of *Brenham* v. *German American Bank* (1892), 144 U. S. 173, 12 Sup. Ct. 975, in which the court followed the ruling in *Merrill* v. *Monticello, supra,* and took the further position that an express charter power to borrow up to a certain amount for general purposes did not imply the authority to issue negotiable bonds incontestable in the hands of a bona fide holder. This decision overrules *Rogers* v. *Burlington* and *Mitchell* v. *Burlington, supra.* The only concession made in the sweeping terms of this decision, is the suggestion that the power to issue bonds might be implied from express power to borrow, where to deny it would render the borrowing power nugatory. Such is the view stated in *Ashuelot National Bank* v. *School District,* 56 Fed. 197, reviewing the Federal decisions up to its date, and has been generally accepted as a correct exposition of the doctrine of the United States courts.

The existing rule of the Federal courts just stated obtains in Alabama, Illinois, Louisiana, New Jersey and Texas, while the older rule is in force in Massachusetts, Arkansas, Georgia, Kentucky, Nevada, Ohio, New York, Rhode Island, Virginia and Wisconsin. Dicta favoring one rule or the other also occur in the decisions of other States. Illinois is the only State apparently which receded from an adherence to the earlier view. Recent cases are more or less controlled by statutory regulation, either covering the entire subject or, to some extent, affecting the rule previously worked out in decided cases. Citation in detail of numerous cases found in the books would not especially advance the discussion. The cases favoring either view are referred to in 19 R. C. L. p. 991, in notes 17 and 18, and collected and considered in the note to *Weil* v. *New-*

*bern,* Ann.'Cas., 1913E, 25, at pp. 39, 40, 41 (126 Tenn. 223, 148 S. W. 680).

The reasoning upon which is based the proposition now held as law in the Federal courts, that the power to borrow money by virtue of legislative authority so to do, will not carry with it the power to issue negotiable bonds, is perhaps best stated in the quotation from the case of *Police Jury* v. *Britton,* 82 U. S. (15 Wall.) 566, occurring in the opinion in *Merrill* v. *Monticello, supra,* at p. 689, as follows: "We do not mean to be understood that it requires, in all cases, express authority for such bodies to issue negotiable paper. The power has frequently been implied from the other express powers granted. Thus, it has been held that the power to borrow money implies the power to issue the ordinary securities for its repayment, whether in the form of notes, or bonds payable in the future. . . . But in our judgment these implications should not be encouraged or extended beyond the fair inferences to be gathered from the circumstances of each case. It would be an anomaly, justly to be deprecated, for all our limited territorial boards, charged with certain objects of necessary local administration, to become the fountains of commercial issues, capable of floating about in the financial whirlpools of our large cities."

The opposing doctrine has, perhaps, never been better stated, than in the dissenting opinion of Mr. Justice Harlan in *Brenham* v. *German American Bank, supra,* where he states (p. 196): "It seems to us that the court, in the present case, announces for the first time that an express power in a municipal corporation, to borrow money, for corporate or general purposes, does not, under any circumstances, carry with it, by implication, authority to execute a negotiable promissory note or bond for the money so borrowed, and that any such note or bond is void in the hands of a bona

fide holder for value. There are, perhaps, few municipal corporations anywhere that have not, under some circumstances, and within prescribed limits as to amount, express authority to borrow money for legitimate, corporate purposes. While this authority may be abused, it is often vital to the public interests that it be exercised. But if it may not be exercised by giving negotiable notes or bonds as evidence of the indebtedness so created—which is the mode usually adopted in such cases—the power to borrow, however urgent the necessity, will be of little practical value. Those who have money to lend will not lend it upon mere vouchers or certificates of indebtedness. The aggregate amount of negotiable notes and bonds, executed by municipal corporations, for legitimate purposes, under express power to borrow money simply, and now outstanding in every part of the country, must be enormous. A declaration by this court that such notes and bonds are void, because of the absence of *express* legislative authority to execute *negotiable* instruments for the money borrowed, will, we fear, produce incalculable mischief. Believing the doctrine announced by the court to be unsound, upon principle and authority, we do not feel at liberty to withhold an expression of our dissent from the opinion."

It appears that stress is here laid upon the issuance of negotiable bonds as a well recognized and usual method of borrowing money where the power to do so has been conferred by legislative grant. Such appears to be the law as generally understood in the older communities at about the date when the Supreme Court of the United States reversed its former rulings by its decision in *Brenham* v. *German American Bank, supra.* In *Bunch's Ex'or.* v. *Fluvanna County* (1890), 86 Va. 452, 456, the court, in its opinion, observes: "No point is made as to the validity of the act of Octo-

ber 27, 1863, and we do not doubt that it was competent for the county court, under the authority conferred by the act, to issue bonds for the money authorized to be borrowed. The power to do so was implied in the power to borrow. That express power to a municipal corporation to borrow money includes the power to issue its bonds, or other usual securities, to the lender, is a proposition now too well settled to be questioned. Without such incidental power, the power to borrow money would ordinarily be nugatory, and wherever a general power to do a thing is given, every particular power necessary for doing it, is included."

To a like effect is the decision of the Supreme Judicial Court of Massachusetts in the case of *Commonwealth* v. *Williamstown* (1892), 156 Mass. 70, 30 N. E. 472. This case considered the validity of certain railroad aid bonds issued by the defendant town, and founded upon a law authorizing certain towns to borrow money for that purpose. The power given by the Legislature to some fourteen towns, including the defendant, was to subscribe to the stock of a railroad company and raise the required money by loans or taxes. The Legislature prescribed a method or terms of raising the money. The defendant town contested the validity on the ground of lack of authority to issue bonds as implied from the power to borrow. The court held that as no method was prescribed to effectuate the permitted borrowing, the town "might adopt any method that was usual." The opinion states: "We can have no doubt, therefore, that in this Commonwealth the power given to the towns to raise these large or unusual sums of money by loans, no conditions or restrictions being imposed, carried with it the power to issue bonds; a method which certainly enabled the towns to seek the best markets." The court then cites Dillon on Municipal Corporations as upholding this view, referring to

the earlier edition, above quoted in this opinion, and continues: "Many decisions are cited in support of this statement, but the recent decision in *Merrill* v. *Monticello*, 138 U. S. 673 [11 Sup. Ct. 441], is to the contrary. However it may be elsewhere, our decisions rest upon the usage and general course of legislation in this Commonwealth." It will be observed that the court reaches its conclusion, after consideration of the action of the Supreme Court of the United States in *Merrill* v. *Monticello, supra*, and the case has stood unchanged in application, and in no way distinguished or modified, as representing the present law in Massachusetts.

In the earlier case of *Williamsport* v. *Commonwealth* (1877), 84 Pa. St. 487, the power to issue bonds implied from the power to borrow money is sustained, and the earlier New York cases, *Kelly* v. *Mayor*, 4 Hill, 263, and *Ketchum* v. *Buffalo*, 14 N. Y. 356, are quoted in support of the position taken. The course of Federal decisions down to date, including *Police Jury* v. *Britton, supra*, are noticed in the opinion.

In the monograph by Dean entitled Municipal Bonds Held Void, it appears that down to the publication of the book in 1911, bonds of municipal corporations in New England have been held void or their issue enjoined in only three instances, and in no case involving the point under consideration.

The precise question now considered has never been considered by this court. There was involved in the case of *Bridgeport* v. *Housatonic R. Co.*, 15 Conn. 475, a situation in which the plaintiff city had in 1837 voted to subscribe for stock of the defendant to the amount of $150,000, and to issue *coupon* bonds to that amount, which bonds were issued to the defendant and its assigns, divided into bonds of $1,000 each, with coupons payable to bearer. In 1838, the action of the city was

validated by an Act of the General Assembly and power given to do all acts necessary to effectuate its former action.  An action was brought upon one of the coupons before a justice of the peace, and finally, through a succession of appellate proceedings, reached this court. One of the claims advanced by the plaintiff was that the original action of the city before its legislative confirmation was valid as a proper exercise of its corporate powers.  In view of the provisions of the validating Act, the court declined to pass upon this question, but remarked in connection therewith that while municipalities derive their powers from legislative grant, "it has long been an established principle in the law of corporations, that they may execute all the powers within the fair intent and purpose of their creation, which are reasonably proper to give effect to powers expressly granted.  In doing this, they must have a choice of means adapted to ends, and are not confined to any one mode of operation."  This principle was expressly approved in *S. O. & C. Co.* v. *Ansonia Water Co.,* 83 Conn. 611, 633, 78 Atl. 432, a case, however, which did not involve a municipal corporation.

The underlying reason of decision in those States where the power to issue bonds implied from the power to borrow money is denied, seems to be that the power is a dangerous one, in that negotiable bonds in the hands of a bona fide purchaser are not subject to most equitable defenses, and hence municipalities may suffer greatly from an indebtedness incurred under the forms of law, and evidenced by bonds improvidently and sometimes corruptly issued and their proceeds misapplied.

On the other hand, such implied power is sustained on the ground that the power to borrow is practically ineffective where large loans are concerned unless resort may be had to ordinary and well recognized methods of

issuing corporate securities, and any attempt to evidence indebtedness by instruments not fully negotiable would either fail, or, if carried out, could only be effected with inconvenience in debt administration, and the burden of higher interest charges which are uniformly imposed on any security which departs from the ordinary type prevailing in the investment market.

Having regard to the authorities above cited and the ordinary course of corporate financing which they recognize and evidence as prevailing in the jurisdictions to which they pertain, we are satisfied that the power to issue bonds implied from the express power to borrow has been recognized as legal in the majority of the older States, and especially in New England, and that corporate securities have been issued and are now outstanding in large amounts, based upon this understanding of the law. The decisions in which this power is denied assert the necessity of legislative grant to confer it. We regard the power as so firmly established by usage and authority that it can only be taken away by legislative denial or limitation, and ought not to be negatived by judicial interpretation. The effective curb upon hasty and inexpedient financing by municipal corporations lies in the debt limit, which in late years has become almost universal, and exists in this State, and not in making a distinction between the power to borrow and the form of evidence of indebtedness.

We may here remark that it appears from the vote authorizing the bond issue that the proceeds are to be used primarily for the erection of a new schoolhouse, and then any overplus is to be applied to the retirement of indebtedness previously contracted for school sites and the enlargement of an existing schoolhouse, so that there is not presented for our decision a question of a floating debt incurred in the ordinary conduct and operation of the public school system.

It is further contended by the plaintiff that the debt limit, as regards the issuance of bonds, imposed by statute upon school districts and other municipalities (Public Acts of 1923, Chapter 111), which provides that "no municipality or subdivision thereof shall incur any indebtedness through the issue of bonds in excess of five per centum of its grand list, unless otherwise provided by special act. For the purpose of this act the grand list of every municipality shall be construed to include, in addition to the taxable real estate and tangible personal property, the fair market value of the tax exempt real estate therein . . . ,"—should be held to be based upon the aggregate indebtedness of the Town of Middletown, the City of Middletown, and the Middletown City School District, as compared with the aggregate of their respective grand lists.

The question arising out of this claim has arisen with some frequency in other jurisdictions, which have adjudicated similar provisions, and the authorities therein are overwhelmingly adverse to the plaintiff's contention. "Where two or more corporations or political bodies are wholly or partly coincident in territory, they are nevertheless regarded as separate bodies for the purpose of constitutional limitation, unless the contrary is expressed in the constitution." 5 McQuillin on Municipal Corporations, § 2214. Of course, a statutory debt limitation, such as prevails in this State, should receive the same interpretation as one existing in the Constitution. See, to the same effect: 1 Dillon on Municipal Corporations (5th Ed.) § 192; 19 R. C. L. p. 987.

It is unnecessary to cite the cases confirming the conclusions of the text-writers. They are all one way. This the plaintiff concedes, but claims that the peculiar wording of the Connecticut statute requires a different construction. This claim is based upon the use of the

word "subdivision" in the phrase "no municipality or subdivision thereof." It is claimed that the municipal unit in Connecticut is the town, and that the statute should be construed as if it read "no town or subdivision thereof." This is not an admissible construction. The City of Middletown and the Middletown City School District are not mere subdivisions of the town, except using the word simply as a territorial designation, in which case it would have no significance as bearing upon the point in question. Except territorially a city is no more a subdivision of a town than a town is a subdivision of a county. The Town, the City and the City School District, all within the territorial limits of the Town, are each municipalities, independent of each other, and each performing different functions, discharging different duties, and exercising different powers, by virtue of charter provisions or general laws, and not interdependent except in some matters expressly provided for by statute. The City of Middletown and the City School District happen to occupy coterminous territory, but they exist for entirely different purposes. The City School District provides schools and all tangible apparatus and conveniences for the conduct of the public schools therein, and apparently, from the facts found in the reservation, also conducts the educational instruction. The City has nothing to do with these operations and conditions. The two municipalities named comprise the same area and the same population, but acting officially they pursue entirely different aims and objects. To make the pursuit of these aims and objects by the one body conditioned upon those of the other in the way of indebtedness, would go far to hamper the proper activities of each. The possibilities in this regard do not need to be dwelt on, nor is it necessary to support the interpretation which we put upon the debt limit statute, which to us seems

plain in its terms, and to negative the contention of the plaintiff. When we come to read the second sentence of the section of the statute last quoted, and find the term " grand list " therein defined as the sum of the real property and tangible personal property "therein," it would appear that there is no ground for the interpretation desired by the plaintiff. Answering the claim of the plaintiff that his construction of the statute is necessary to give any effect to the word subdivision, we need only say that there exist in the State municipalities made up by consolidation of prior existing public bodies corporate, in which are kept intact in the constituent subdivisions certain powers of taxation and borrowing arising out of the ownership and operation of public works, and there may be other reasons for the use of the word, out of abundant caution, which have not come to our attention.

We, therefore, conclude that the provision relating to the debt limit applies to each of the three municipalities within the limits of the area of the Town of Middletown in such a way that no one of them is in any way affected by conditions existing in the others as to the amount of their grand lists and municipal bonds, and that the defendant district may issue bonds up to five per centum of its individual grand list as defined in the statute.

The conclusions reached render it unnecessary to consider the claims of the parties with reference to the amount of the actual combined indebtedness of the three municipalities, and what items should be legally included therein.

The first question propounded is answered in the affirmative. To the second and third questions we answer that by the terms of the resolution of the District a bond issue of $200,000 in amount is provided for and that amount must be issued with the application of the

proceeds thereof of enough to pay for the erection of the schoolhouse and the overplus is to be applied to the payment of the indebtedness of the District, existing as set forth in the resolution and finding.

The Superior Court is advised to render a declaratory judgment in accordance with this opinion.

No costs in this court will be taxed in favor of either party.

In this opinion the other judges concurred.