COMMONWEALTH *vs.* INHABITANTS OF WILLIAMSTOWN.

Suffolk. November 18, 19, 1891. — February 26, 1892.

Present: ALLEN, KNOWLTON, MORTON, & LATHROP, JJ.

*Town Subscription for Railroad Shares — Town Bonds — Railroad Bonds — Condition Precedent.*

The power given by the St. of 1855, c. 394, authorizing certain towns to subscribe for shares in the capital stock of a railroad, to a certain amount, and under certain conditions, and to raise by loans or taxes any sums of money required to pay the instalments on their respective subscriptions, carried with it, in the absence of legislative conditions or restrictions, the power to issue negotiable bonds; and the issue of such bonds was held not to be irregular and invalid because the bonds were delivered directly to the officers of the railroad company in exchange for the stock for which the town had subscribed, instead of being sold for money, or because the bonds were all delivered by the committee of the town at one time instead of by instalments, there being no mention of instalments, either in the terms of the subscription or in the report of the case.

A railroad company issued to the Commonwealth a bond of indemnity in the sum of $2,000,000, for advances under the St. of 1854, c. 226, and secured the same by a first mortgage upon its property. It shortly afterwards issued a mortgage to trustees to secure its bonds to the amount of $900,000. A town authorized by the St. of 1855, c. 394, to subscribe for shares in the capital stock of the company, voted to subscribe for a certain number thereof, and to pay for the same in its bonds; but on the condition precedent that the first mortgage bonds of the company to a certain amount should be deposited in bank for the

security of the town. Bonds of the second issue were so deposited. *Held*, that these were the bonds contemplated by the vote of the town, and that the condition precedent was complied with.

CONTRACT to recover certain instalments of interest upon thirty-two thousand two hundred dollars of bonds.

At the hearing in the Superior Court, before *Thompson, J.*, it appeared that by the St. of 1854, c. 226, the Treasurer of the Commonwealth was authorized to issue bonds in its name to the amount of $2,000,000, and to deliver the same to the treasurer of the Troy and Greenfield Railroad Company under certain conditions, one of which was that the company should issue to the Commonwealth a bond of indemnity in the said sum of $2,000,000; that soon thereafter, in July, 1855, the railroad company executed to the Commonwealth a mortgage and bond conformably to the provisions of said statute; that by the St. of 1855, c. 394, the defendant town and each of fourteen other towns were authorized to subscribe for shares of said railroad, " provided the inhabitants of such town or towns, at a legal town meeting duly called for that purpose, shall vote by a two-thirds vote to subscribe for such shares in accordance with the terms of this act, to pay for the same out of the town treasury, and to hold the same as town property, subject to the disposition of the town, for public purposes, in like manner as any other property which it may possess," and " said towns are hereby authorized to raise, by loans or taxes, any sums of money which shall be required to pay the instalments on their respective subscription to said stock and interest thereon"; that on July 30, 1855, the above railroad company executed a mortgage to Jerome V. C. Smith and others to secure the payment of bonds to the amount of $900,000, which were the first bonds of the company secured by mortgage except the bond of indemnity to the Commonwealth; that thereafter, in April, 1858, the town of Williamstown voted in town meeting to subscribe to the capital stock of the Troy and Greenfield Railroad Company to the extent of three hundred and thirty shares upon certain conditions, one of which was, " To protect the town against the possibility of loss of the stock from such a contingency as the sale of the Troy and Greenfield Railroad by the bondholders, the first mortgage bonds of the Troy and Green-

field Railroad Company to the extent of thirty-three thousand dollars shall be placed in the Adams Bank under charge of a committee to be appointed by the town, to be held until the town shall be satisfied that such security is no longer necessary, and shall direct the committee, by a vote of the town at a general or special meeting, to surrender them"; and that subsequently thereto, and before the town bonds were issued, bonds to the amount of $33,000, which were secured by the mortgage to Smith and others, dated July 30, 1855, were deposited in the bank for the security of the town.

Upon these facts, and others which are now immaterial, the court found for the plaintiff in the sum of $2,368.63. The defendant alleged exceptions, and, at his request, the court reported the case for the determination of this court.

*F. E. Snow,* (*J. Bennett* with him,) for the defendant.

*H. C. Bliss,* for the Commonwealth.

ALLEN, J. By the St. of 1855, c. 394, the town of Williamstown and each of fourteen other towns were authorized to subscribe for shares in the capital stock of the Troy and Greenfield Railroad Company to a certain amount and under certain conditions, and to raise by loans or taxes any sums of money which should be required to pay the instalments on their respective subscriptions. The Legislature prescribed no terms or method to be observed in raising the money by loans, and therefore the towns might adopt any method that was usual. *Meyer* v. *Muscatine,* 1 Wall. 384. *Seybert* v. *Pittsburg,* 1 Wall. 272. *Rogers* v. *Burlington,* 3 Wall. 654, 666. *Police Jury* v. *Britton,* 15 Wall. 566, 572. *Commonwealth* v. *Commissioners of Allegheny,* 37 Penn. St. 237, 241. *Commonwealth* v. *Pittsburgh,* 41 Penn. St. 278. Moreover, it was expressly provided in Rev. Sts. c. 15, § 11, that " towns shall have power . . . to make any contracts, which may be necessary and convenient for the exercise of their corporate powers."

It is well known that as early as 1855, when money was to be raised on loan in considerable amounts, either by the Commonwealth itself, or by cities and towns, or by railroad corporations, a common method of doing it was by means of bonds, then usually called scrip or certificates of debt, which were to be

negotiated in the market. This is not only a matter of general knowledge, but it is shown by numerous statutes in which the issue of such scrip was specially authorized or recognized, and also by cases in the books. This is so familiar that we will merely cite illustrative instances. Sts. of 1837, cc. 172, 190; 1838, cc. 9, 125, 193; 1839, cc. 70, 74; 1841, c. 131; 1844, c. 33; 1846, c. 251; 1849, cc. 187, 191; 1850, cc. 175, 233; 1851, cc. 60, 341; 1852, cc. 76, 210, 244; 1853, c. 422; 1854, cc. 134, 226, 338, 351, 354, 423; 1855, cc. 14, 19, 24, 61, 179, 368, 395, 435, 456. *Chapin* v. *Vermont & Massachusetts Railroad*, 8 Gray, 575. *Edwards* v. *Marcy*, 2 Allen, 486. *Haven* v. *Adams*, 4 Allen, 80. *White* v. *Vermont & Massachusetts Railroad*, 21 How. 575. Statistics show that in 1855 railroad corporations in Massachusetts had issued bonds to the amount of over $15,000,000, some of which had been specially authorized, and some not. The statutes of 1846, c. 251, and 1849, c. 191, required railroad corporations to make returns concerning their funded debts. The St. of 1852, c. 76, made all corporate bonds payable to bearer or order negotiable. The St. of 1854, c. 286, by a general law prescribed the terms and conditions upon which railroad bonds might thenceforth be issued. Previously to that, the power of a railroad corporation to issue bonds was unrestricted. *Commonwealth* v. *Smith*, 10 Allen, 448.

We can have no doubt, therefore, that in this Commonwealth the power given to these towns to raise these large or unusual sums of money by loans, no conditions or restrictions being imposed, carried with it the power to issue bonds; a method which certainly enabled the towns to seek the best markets. It is indeed laid down as a sound doctrine of general application in 1 Dillon, Mun. Corp. § 125, that "Express power to borrow money, perhaps in all cases, but especially if conferred to effect objects for which large or unusual sums are required, as for example subscriptions to aid railways and other public improvements, will ordinarily be taken, if there be nothing in the legislation to negative the inference, to include the power (the same as if conferred upon a corporation organized for pecuniary profit) to issue negotiable paper with all the incidents of negotiability." Many decisions are cited in support of this statement, but the recent decision in *Merrill* v. *Monticello*, 138 U. S.

673, is to the contrary. However it may be elsewhere, our decision rests upon the usage and the general course of legislation in this Commonwealth.

It is contended by the defendant that, even if the town had power to borrow money and issue the bonds therefor, the issue was irregular and invalid, because the bonds were delivered directly to the officers of the railroad company in exchange for the stock for which the town had subscribed, instead of being sold for money. The bonds appear to have been taken at par, and there has been no proof or suggestion, and so far as we are aware there is no reason to suppose, that they would have brought more than par in the market. The State got them at that rate. If the railroad company was willing to take them at their full value, it would have been a vain and useless proceeding to require the towns to sell them in the market for cash and pay over the money to the railroad company. This was not necessary. *Commonwealth* v. *Commissioners of Allegheny*, 37 Penn. St. 237, 241. *Rogers* v. *Burlington*, 3 Wall. 654, 666, 667.

The defendant further contends that the delivery of the bonds was invalid because all were delivered at one time; and that the statute only authorized payments by instalments. But by the terms of the subscription we must now assume that all the instalments, if there were any, might be paid at once. We find no mention of any instalments, either in the terms of the subscription, or in the report of the case; nor anything to show that it was irregular or improper for the committee of the town to deliver the bonds at the time when they were delivered.

It is also urged in defence that the deposit of " the first mortgage bonds of the Troy and Greenfield Railroad Company to the extent of $33,000 " in the Adams Bank, for the security of the town, was a condition precedent to the issue of the town bonds. But this condition was complied with. It is true that the railroad company had already issued to the Commonwealth a bond of indemnity in the sum of $2,000,000, and secured the same by a first mortgage upon the property of the company. This was to indemnify the Commonwealth for its advances under the St. of 1854, c. 226, and the issue of the mortgage was of such notoriety that it may be regarded as a historical event. Shortly afterwards, another mortgage was issued to secure bonds

of the company to the amount of $900,000. These were the first and only bonds of the company secured by mortgage, except the bond of indemnity to the Commonwealth. There can be no room for doubt that these were the bonds contemplated by the vote of the town. To protect the town against such a contingency as the sale of the railroad by the bondholders, the first mortgage bonds of the Troy and Greenfield Railroad Company to the amount of $33,000 were to be placed in the bank, to be held until a vote of the town should be passed directing the surrender of them to H. Haupt & Co. A certain specific kind of bonds was referred to, and no other bonds could possibly be in the mind of the parties except such as were in fact so deposited. The bonds of the company for the payment of money were intended, and the bonds which were deposited in the bank were the first bonds of that character which were secured by mortgage ; and the language of the vote, wher construed in the view of the circumstances, is applicable to them. The town got the bonds for which it stipulated.

We do not need to enter upon the questions of ratification and estoppel, which have been discussed at the bar.

*Judgment for the Commonwealth on the finding.*